AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Southern District of Ohio

| United States of America | ) | |
| | ) | |
| SONGGUO ZHENG | ) | Case No.    2:20-mj-375 |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ May 23, 2020 _____ in the county of _____ United States _____ in the _____ Southern _____ District of _____ Ohio _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 666 (Fraud or Bribery Concerning Programs Receiving Federal Funds) | |
| 18 U.S.C. § 1001(a)(1) (Statements and Entries Generally) (a)(1) (Statements and Entries Generally) | |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Timothy S. Saunders
_Printed name and title_

FBI Special Agent

Sworn to before me and signed in my presence.

Date:  5/23/2020

_____
_Judge's signature_

City and state:  Columbus, OH

Chelsey M. Vascura, United States Magistrate Judge
_Printed name and title_

## AFFIDAVIT PRESENTED IN SUPPORT OF A CRIMINAL COMPLAINT

I, Timothy S. Saunders, Special Agent of the Federal Bureau of Investigation (FBI) being duly sworn, hereby declare as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      This affidavit is presented in support of a criminal complaint charging Song Guo Zheng (aka Songguo ZHENG, hereafter referred to as ZHENG) with the crimes of 18 U.S.C. § 666 (Theft or Bribery Concerning Programs Receiving Federal Funds) and 18 U.S.C. § 1001 (False Statements) (referred to as the SUBJECT OFFENSES).

2.      I am an investigative or law enforcement officer of the United States within the meaning of the United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code.

3.      I have been employed as a Special Agent of the Federal Bureau of Investigation (FBI) since October 2008, and I am currently assigned to the Cincinnati Division, Columbus Resident Agency, as a member of the Counterintelligence Squad. I am responsible for investigating, among other crimes, theft or bribery concerning programs receiving federal funds. I have received both formal and informal training in the detection and investigation of said offense. As a result of my training and experience, I am familiar with the federal laws relating to the theft or bribery concerning programs receiving federal funds. I have participated in various investigations, including those with a foreign counterintelligence nexus. As a federal agent, I am authorized to investigate violations of the laws of the United States.

4.     The facts set forth in this affidavit are based upon the following: my own investigation; information obtained from other law enforcement agencies; legal process, my review of documents and records related to this investigation; oral and written communications with others who have personal knowledge of the events and circumstances described herein; review of public information, including information available on the Internet; and my experiences and background as a Special Agent of the FBI. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that violations of U.S. law occurred. Also, where I refer to conversations and events, I often refer to them in substance and in relevant part rather than in their entirety or verbatim, and figures and calculations set forth in this affidavit are approximate, unless otherwise noted.

## APPLICABLE STATUTES AND DEFINITIONS

5.     I am advised that:

a.     Title 18, United States Code, Section 666(a)(1)(A) states, in relevant part:

> (a) Whoever, if the circumstances described in subsection (b) of this section exists—
>
> > (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—
> >
> > > (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—(i) is valued at $5,000 or more, and (ii) is owned by, or is under the care, custody, or control of such organization, government or agency . . . shall be fined under this title, imprisoned not more than 10 years, or both.

2

b.　　Title 18, United States Code, Section 666(b) states, in relevant part: "The circumstances referred to in subsection (a) . . . is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant . . . ."

c.　　The provisions of 18 U.S.C. § 666 and its subparts cover, among other crimes, the crimes of embezzlement, fraud, or conversion, so far as those crimes concern any property, regardless of whether the property itself can be traced directly as federal property—as long as the owner of the property, which is an organization, or State or local government, received $10,000 in federal funds, and so long as the property is valued at $5,000 or more. *See, e.g., United States v. Valentine*, 63 F.3d 459, 464 (6th Cir. 1995) ("Thus, we find that the statute does not require the government to demonstrate the federal character of stolen property. The statute addresses the relationship between the federal government and the local government from which the property was stolen, not the relationship between the federal government and the converted property.")

6.　　I am also advised that:

a. Title 18, United States Code, Section 1001(a) provides, in relevant part, that "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact" or "makes any materially false, fictitious, or fraudulent statement or representation" is in violation of federal law.

## SUMMARY

7.　　I am currently investigating ZHENG for committing grant fraud (18 U.S.C. § 666) and engaging in a scheme to conceal a material fact or facts (18 U.S.C. § 1001(a)(1))

3

related to more than approximately $4,339,000 in grant funding that ZHENG and his research group(s) received from the National Institutes of Health (NIH). NIH revealed that ZHENG has received funds and serves as the Principal Investigator (PI) on two active NIH awards, R01 AR059103, with funds totaling approximately $3,573,000, and R61 AR073049, with funds totaling approximately $766,000. ZHENG also has one pending NIH award, R01 AR077009, for which he has not yet received funds. In addition, based upon open source information derived from ScienceNet.cn,[1] accessed by NIH on 4/14/2020 (fund.sciencenet.cn), NIH noted ZHENG also appears to have received funding from and is listed as the Project Manager (PM) on at least three National Natural Science Foundation of China (NNSFC) grants that have overlapping timeframes with NIH grants R61 AR073049 and R01 AR059103. This overlap was disclosed by ZHENG to NIH. The NNSFC grants associated with ZHENG include Numbers 30728007, 81871224, and 81671611. As part of the NIH Grant applications, ZHENG made either untimely, incomplete or no disclosure of foreign components, foreign affiliation, or foreign funding, to his employer(s), causing false statements to be made in NIH Grant applications in violation of Title 18, United States Code, Section 1001.

8.    In order to receive NIH funding, non-NIH research institutions must submit a detailed application describing, among other things, the purpose and scope of the proposed research, the amount of funding requested, and how the funding will be used. Both during the application process and periodically after an award is made, the institution must also disclose to NIH all foreign collaboration and foreign sources of research support, including, but not limited

---

[1] According to its Wikipedia page, ScienceNet.cn is a science virtual community and science blog that is supported by the Chinese Academy of Sciences (CAS) and the NNSFC with a mission of establishing a global Chinese science community.

to, research grants, cooperative agreements, contracts and/or institutional awards.[2] Additionally, NIH requires research institutions to identify and disclose to NIH significant (typically greater than $5,000) financial conflicts of interest (COI) by investigators (that is, the person or persons responsible for the design, conduct, and reporting of research), including those related to funds received from a foreign institution of higher education or the government of another country.[3] Although it is the research institution itself that submits the grant application and all other grant-related disclosures to NIH, the individual investigator(s) must certify to the institution and NIH that the information contained in grant applications, post-award submissions, and all other grant-related filings is accurate and complete, and also acknowledge that any false, fictitious, or fraudulent statements or claims made to NIH may subject the PI to criminal, civil, and/or administrative penalties.

9.      Based upon Your Affiant's review of NIH applications, just-in-time submissions and Reporting Period Progress Reports (RPPR), opportunities for disclosure of "other support" by the PI are built into the aforementioned processes. As part of the application process, ZHENG submitted an application for NIH Grants R61 AR073049 and R01 AR059103 on or about April 19, 2019. The applications called for the disclosure of any "Ongoing Research Support." In his grant applications, ZHENG disclosed ongoing research related to other NIH

---

[2] NIH Grants Policy Statement, Section 1.2, defines "other support" as "all financial resources, whether Federal or non-Federal, commercial or institutional, available in direct support of an individual's research endeavors, including but not limited to research grants, cooperative agreements, contracts, and/or institutional awards. This includes research support from foreign governments or entities. Applicants must provide updated other support information prior to award via just-in-time and are required to identify any changes in other support in each annual progress report."

[3] Public Health Service (PHS) Financial Conflict of Interest Regulations, 42 CFR 50, Subpart F, require investigators to disclose to their institution all significant financial interests including those related to funds received from a foreign institution of higher education or the government of another country.

affiliated projects but did not disclose his Chinese Grants, 81671611, active from on or about January 1, 2017 through on or about December 31, 2929, and 81871224, active from on or about January 1, 2019 through on or about December 31, 2019. Further, as part of the annual review process, ZHENG submitted a Reporting Period Progress Report (RPPR) regarding NIH Grant R01 AR059103 on or about April 4, 2016, March 13, 2017, January 16, 2019 and January 15, 2020. The RPPR, in Section D.2.c, seeks information on "Changes in Other Support." In three of the four RPPRs, ZHENG disclosed changes to ongoing research related to NIH projects, but in all four of the submissions, ZHENG did not disclose his active Chinese grants. Based on a review of the timeframes of the four RPPR submissions noted above, the active Chinese grants should have been captured. According to NIH, no RPPRs were submitted by ZHENG for Grant R61 AR073049.

10.    Additionally, NIH reports that Grant R01 AR059103, in the amount of approximately $364,500, was initially awarded to ZHENG, as the PI, through the University of Southern California (USC), on or about June 28, 2010. The grant was subsequently submitted for a 'Change of Grantee Organization' to Pennsylvania State University (PSU) by ZHENG on or about August 13, 2013, due to his institution transfer, and was then submitted for another 'Change of Grantee Organization' by ZHENG on or about April 19, 2019, due to his institution transfer to The Ohio State University (OSU). The Grant (7 R01 AR059103-10) was renewed and awarded to OSU on or about July 29, 2019, in the amount of approximately $343,200, and listed ZHENG as the PI. The projected start and end dates of the project were on or about July 1, 2010 and February 28, 2021, respectively. Other than on one occasion, when an untimely and suspected incomplete disclosure was made via a Revision Application to Grant Renewal 2 R01 AR059103-07, no disclosure of foreign components, foreign affiliation, or foreign funding was

6

included with either the Change of Grantee Organizations, renewals, or in the original application. Regarding the aforementioned Revision Application, a revision was submitted on March 3, 2016 for an 'Administrative Supplement' to 2 R01 AR059103-07 that was originally submitted on June 30, 2014. Included in the revision application, which was submitted 612 days after the original renewal application, ZHENG listed in the 'Ongoing Research Support' portion of his 'Biographical Sketch' section that he was the PI for a Sun Yat-Sen University (SYU) Key Project from July 1, 2014 – June 30, 2017.

11.     Your Affiant confirmed the following information through communications with OSU, a review of OSU records, as well as documentation obtained from NIH. ZHENG works as a professor and researcher at OSU in the field of Rheumatology and Immunology and has been with the university since approximately January 2019. Prior to joining OSU, ZHENG was a Professor of Medicine and Director of Rheumatology Research in the Department of Medicine at PSU Hershey College of Medicine from approximately 2013 – 2019. Prior to PSU, ZHENG was a post-doctoral fellow, Assistant Professor and an Associate Professor at the Keck School of Medicine, Division of Rheumatology at USC from approximately 2000 – 2012.

**ZHENG's HUNDRED AND THOUSAND TALENTS PLAN PARTICIPATION**

12.     While employed at OSU, ZHENG also appears to have been employed at Third Affiliated Hospital at Sun Yat-Sen University (TAH), which he did not disclose to either OSU or NIH. Open source research of TAH's Professor Home Page, viewed by Your Affiant on 5/8/2020 (www.zssy.com.cn:8080/professor/intro?id=258), revealed ZHENG's professional titles also include or have included, "Professor at Sun Yat-sen University", located in Guangzhou, Guangdong Province, China; "Director, Clinical Immunology Center, Third Affiliated Hospital at Sun Yat-Sen University"; "Expert of Thousand Talents Program"; and,

7

"Full Professor (with tenure) and Director, Autoimmunity Center, Penn State University Hershey Medical College". Per ZHENG's OSU Biography Page, dated July 31, 2019, no affiliations were listed related to the aforementioned titles.

13.    Open source research conducted on August 19, 2019 identified an article dated March 9, 2014, titled, "The Third Affiliated Hospital of Sun Yat-Sen University, on the open recruitment of leading talent, Professor Songguo Zheng, research assistant" wherein ZHENG is identified as "a leading talent of the 'Hundred Talents Program' (HTP) of SYU" and that ZHENG "publicly recruited a research assistant at home and abroad for the work of scientific research laboratories and international exchanges." Further, an article dated September 13, 2018, titled, "Songguo Zheng – Hanshi Xu joint group found that rheumatoid arthritis fibroblast-like synoviocytes invade secrets" identified ZHENG as an "Expert of the National Thousand Talents Program of the China Central Organization Department."

14.    In an article viewed by Your Affiant on May 6, 2020, via SYU's Office of Scientific Research and Development website (http://research.sysu.edu.cn/node/1778), ZHENG was selected as one of six leaders included in the sixth batch of the Pearl River Talent Program (PRTP). It is believed the sixth batch of the PRTP was selected in or around May 2017. In the announcement, it was noted ZHENG's research team name was "Clinical Immunology Precision Diagnosis and Treatment Translational Medicine Innovation Team," the research area was listed as "Biotechnology and New Medicine," and the employer was listed as the "Third Affiliated Hospital." The PRTP was launched in 2009 and supports innovative talents and teams in the Guangdong Province, China.

15.    ZHENG has been a professor at OSU since in or around January 2019. With respect to the time periods relevant to this Affidavit, ZHENG made his conflict of interest

8

disclosures for 2018 and 2019 to OSU in or around February 12, 2019, and April 16, 2019, respectively, via the e-COI Disclosure portal. At that time, OSU's FCOI Policy, which was edited on May 1, 2018, and which was the FCOI Policy in place at the time of ZHENG's grant applications, required disclosure to OSU of external financial interests that could be viewed as a conflict of interest between the professor and the University. In both disclosures noted above, ZHENG completed disclosures related to OSU's Office of Research Compliance, their Office of University Compliance and Integrity and the OSU Wexner Medical Center and self-approved that he had no significant financial interest that is related to institutional responsibilities. According to your affiant this information has not been provided to NIH.

**RECENT EVENTS**

16.     On or about May 22, 2020, a physical and electronic search warrant was signed by a Magistrate Judge in the U.S. District Court for the District of Alaska.

17.     On or about May 22, 2020, ZHENG arrived at Ted Stevens Anchorage International Airport (ANC) on VistaJet (VJT) airlines flight number 981, a private charter flight. The flight manifest indicated ZHENG was traveling on Chinese passport number E99331562. Upon arrival, all passengers deplaned. While conducting outbound inspections of all the passengers, CBP officers observed ZHENG allow another passenger to take possession of his roller bag and black computer bag. CBP asked this passenger if all the bags in her possession were hers, to which she responded that the two bags belonged to ZHENG. When asked if they were traveling together, the other passenger replied that they were not and they did not know each other, she was just helping him as he had too many bags. ZHENG was then asked and confirmed the two bags were his. When CBP opened these items of luggage, they identified numerous electronic devices. CBP also separated ZHENG's luggage from that belonging to the

other passengers on the flight. ZHENG had a substantial amount of luggage. However, only his carry-on luggage contained any electronic devices. When asked later about this event, ZHENG claimed the other passenger had asked to help him with his luggage. The affiant believes this is significant because ZHENG was attempting to hand over all of his luggage containing his personal electronic devices to another passenger, possibly in an attempt to prevent the U.S. Government from gaining access to these items.

18.     CBP questioned ZHENG about the reason for his travel. ZHENG indicated he was "going home," per context, moving to China, and was not coming back. ZHENG was then handed off to FBI Anchorage (AN) personnel for an interview. ZHENG initially indicated he was from Ohio and going to the PRC to retire. When the formal interview commenced, ZHENG changed his story and indicated the reason for his travel was to visit his sick father in China and would come back to the US. When confronted about why he changed his story, ZHENG said he did not know why he originally said he was moving to China. ZHENG added that of course he wants to retire and retiring is his dream. CBP information did not identify a return flight to the U.S. for ZHENG. ZHENG later indicated he had no return flight but is return flight would again be on a chartered flight because of an unidentified friend in Los Angeles. Your affiant believes that ZHENG's first answer was accurate, and that he had no intention of coming back to the US and when confronted changed his story. This is further verified by information surrounding his story about his sick father.

19.     ZHENG was asked about the circumstances of his travel to the PRC on the charter flight. ZHENG indicated that his father was sick, and he needed to get back to the PRC, and this was the only flight he could get. When the FBI conducted a query and confronted ZHENG with

10

information indicating a commercial flight to the PRC on or about May 23, 2020, was in fact available,. available and confronted ZHENG that he was lying, the discussion became heated and he demanded to see the information. When the FBI moved to show him the information, ZHENG backed down and said it was unnecessary to prove it to him. Your affiant believes this indicates ZHENG was aware there were other flights available and the FBI did not need to prove it to him. When ZHENG was told he had missed his flight to the PRC, he was upset for a very brief period of time, but quickly recovered when he learned another flight was available, which the FBI interviewers believed was a show, as if he were trying to display worry about his sick father. However, he quickly recovered when he was told there were other flights that he could take. Your affiant believes this indicates he was not actually concerned about his sick father, but was more concerned about leaving the United States.

20.     Further, in regards to the charter flight, ZHENG indicated the above described "friend" in Los Angeles had arranged the seat on the flight for him. ZHENG also indicated his ticket on this flight was free and when there had been an unspecified issue with a permit for the flight, ZHENG had contacted another unidentified friend who got a permit for the flight so it could operate. Your affiant believes based on the above that ZHENG was desperate to leave the United States quickly, and utilized powerful or influential friends in order to obtain a seat on a private charter flight and ensure it was able to leave the US.

21.     ZHENG was asked about his affiliation with LI Bin at SYSU's Third Affiliated Hospital based on an open source article identifying their joint scientific discovery, which was similar to his NIH-funded work. Specifically, he was asked whether he had provided or been asked to provide LI or any other Chinese university or organization information related to NIH-

11

funded research. ZHENG claimed LI must have used his name, but then alleged he had disclosed this joint project to NIH on a grant application. The FBI has found no such disclosure. Your affiant believes ZHENG's denial of a joint project with a PRC researcher in conflict with NIH funding is significant as it demonstrates ZHENG's attempts to hide his foreign affiliations and conflicts.

22.     ZHENG was confronted with a document titled "Six teams from our school were selected into the sixth batch of 'Pearl River Talent Program' to introduce innovative and entrepreneurial teams." The article indicated the Guangdong Provincial Talent Work Leading Group Office had released the sixth batch of PRTP to introduce the selected teams. As described above, your affiant believes this group was selected in May 2017. The article indicated the PRTP was a major initiative of the Guangdong Provincial Party Committee and Provincial Government to accelerate the cultivation of high-level talents and implement innovation-driven development strategies. A spreadsheet in the article contained a list of individuals selected with SYU. ZHENG was listed as a recipient and his employer was listed as TAH, per context, associated with SYU. ZHENG acted upset and indicated they had used his name without his authorization and he was going to sue them. Your affiant believes ZHENG was overreacting to this article in an attempt to cover up his involvement with the PRTP.

23.     Later in the interview, ZHENG indicated he had been recruited into the PRC talent plans but he did not accept the position because he did not want to spend nine months of the year in the PRC. In contradiction, later in the interview, ZHENG indicated he did not know he had to report his affiliation with talent plans. Your affiant believes this statement in fact

indicates ZHENG's acknowledgement of participation in the talent plans, while attempting to deflect responsibility for reporting.

24.     ZHENG admitted he received money from the NNSFC but he claimed he reported it to his then employer USC and they had told him to go ahead with the work. FBI investigation reveals ZHENG was employed by USC from 2010 to approximately 2013. FBI investigation revealed ZHENG received another NNSFC grant in or about January 2017, valid through December 2020. If ZHENG knew to disclose this funding previously, your affiant believes ZHENG should have known he had to disclose the 2017 funding, and FBI investigation has not revealed any disclosures made by ZHENG regarding the 2017 funding.

25.     Your affiant believes ZHENG's evasive answers regarding recruitment and membership in PRC talent plans is significant because ZHENG was aware there was a potential conflict. ZHENG had received numerous admonishments from both NIH and OSU regarding conflicts of interest, and I believe he failed to disclose his overseas activities because he knew they placed his NIH funding at risk. On or about May 13, 2020, ZHENG was confronted by OSU and provided an NIH letter identifying possible failure to disclose outside research support, relevant affiliations, or foreign components. The letter indicated OSU had 30-60 days to provide a written response. FBI investigation revealed ZHENG departed Columbus, OH on May 19, 2020, only six days after receiving this notification. Your affiant believes ZHENG was aware of the concerns and knew he could not mitigate them. He therefore contacted a friend and was afforded a seat on a charter flight back to the PRC and packed up numerous electronic devices and a significant amount of personal items. When confronted, ZHENG initially indicated he was moving permanently, then changed his story to indicate he was visiting a sick relative and later

13

2:20-mj-00375-CMV Doc #: 1 Filed: 05/23/20 Page: 15 of 16 PAGEID #: 15

added he was looking for a job in the PRC. Notably, on or about May 22, 2020, when the FBI interviewed a neighbor of ZHENG in Hilliard, OH, the neighbor indicated the ZHENGs were moving. When ZHENG's wife was interviewed on the same day in Ohio, she did not provide any information about ZHENG's father's illness as the reason for his travel and was evasive about moving.

26.     In ZHENG's checked luggage, a "Comfort Letter" dated July 1, 2018, from SYU was identified. This letter was addressed to ZHENG's then-employer, PSU. The letter absolved ZHENG of any obligation to SYU and indicated there was no conflict of interest (without specifying with whom there would be a conflict). As described above, ZHENG was listed as the PM on an approximately 600,000 yuan award (approximately $86,419 USD as of January 1, 2017) from the NNSFC to SYU in 2017. This award is valid through December 31, 2020. FBI investigation and coordination with OSU and HHS/OIG did not reveal any information indicating ZHENG disclosed this letter to any U.S. universities or NIH. Your affiant believes that this letter is significant for two reasons. First, it reveals ZHENG was aware there could be a conflict based on his commitment and affiliation with SYU. Second, your affiant is aware of instances wherein such letters have been provided to other individuals who are members of PRC Talent Plans to provide to their employers in order to "comfort" their employers, when their obligation and affiliation with the talent plan does in fact not cease.

## CONCLUSION

27.     Through my training and experience as an FBI agent as well as the information derived from the interview of ZHENG and a preliminary review of ZHENG's luggage, personal effects, electronic devices, your affiant has probable cause to believe ZHENG has violated 18

14

U.S.C. § 666 (Theft or Bribery Concerning Programs Receiving Federal Funds) and 18 U.S.C. § 1001 (False Statements) (referred to as the SUBJECT OFFENSES).

## **REQUEST FOR SEALING**

28.     Because this investigation is continuing, disclosure of the Complaint, this affidavit, and/or this application will jeopardize the progress of the investigation. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, tamper with or destroy evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Timothy S. Saunders
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on May 23, 2020.

Honorable Chelsey Vascura
UNITED STATES MAGISTRATE J

15