## IN THE UNTIED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 2:20-mj-000375 |
| | : | |
| Plaintiff, | : | CHIEF MAGISTRATE JUDGE |
| | : | ELIZABETH PRESTON DEAVERS |
| | : | |
| | : | |
| SONG GUO ZHENG, | : | |
| | : | |
| Defendant. | : | **UNDER SEAL** |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR BOND
### AND REQUEST FOR SEALING

The United States of America, by and through Assistant U.S. Attorneys Douglas W. Squires, S. Courter Shimeall, Special Assistant U.S. Attorney Christopher St. Pierre, and Trial Attorney Matthew J. McKenzie of the National Security Division, submit this Government's Response to Defendant's Motion for Bond and Request for Sealing in response to Defendant's Motion for Bond (Doc. No. 10).

Since being charged with a sophisticated medical grant fraud scheme, the defendant's incentive to flee has grown significantly. A search of the items the defendant took with him and an ongoing investigation supports the conclusion he is a flight risk.   Lastly, the defendant is a person of means with a dual life and assets in the Peoples Republic of China (PRC). (See Exhibits A, B). Extradition from China is not a viable option. If the defendant is released, he is a serious flight risk; once he is gone, he will not come back.

1

The government requests all documents remain under seal because of a significant on-going investigation and persons may flee or evidence destroyed in facts and conclusions are revealed. The government asks the Affidavit in support of the felony complaint, also under seal, be made part of the sealed record and the Affidavit is hereby incorporated in this Motion by reference.

## I.    BACKGROUND OF THE CASE

As this Court is well aware, Defendant Song Guo Zheng was arrested on Friday May 22, 2020, in Alaska pursuant to an Arrest Warrant issued in this District supported by a federal Criminal Complaint for violations of grant fraud and false statements. He is before this Court for a detention hearing asking for his release on bond. Defendant Song Guo Zheng, a medical research doctor with strong ties to China, has a significant incentive and means to flee, and most importantly, was leaving for China when apprehended.

While Defendant Song Guo Zheng claims he is committed to addressing the serious allegations against him and was merely taking a short trip to visit a sick father, the evidence indicates there is a significant risk of flight.

Defendant Zheng was apprehended while attempting to leave the United States after his employer, The Ohio State University (OSU), began an administrative process that could have effectively ended his career as a research scientist in the United States. On May 6, 2020, OSU confronted Zheng with a Notice of Institutional Investigation regarding his foreign affiliations and his failure to follow compliance rules. Significantly, an NIH letter was provided to Zheng, which detailed possible failure to disclose outside research support, relevant affiliations, or foreign components. This letter gave OSU a chance to respond to the allegations within sixty

2

days. At the conclusion of the meeting, Zheng was placed on faculty paid administrative leave (this was later changed to unpaid administrative leave on May 30, 2020) and reassigned to home. Zheng was expected to be available for interviews with OSU as Zheng was critical to OSU's response. With no notice he was leaving the country, let alone any notice to OSU that he intended to resign, Zheng attempted to leave the United States.

Zheng packed three large bags for a long, if not permanent, journey; one small suitcase and a briefcase containing two laptops, three cellular telephones, several USB drives, several silver bars, and expired Chinese passports (for his family members). (See Exhibit C). Zheng also had with him deeds for property in China. (See Exhibit B). The flight he booked was a very expensive charter flight, which he claimed was the only flight available to get him home in time to see his sick father. However, the FBI had conducted instant open source searches and identified available commercial flights to the PRC, including one for the following day. (See Exhibit C).

At the first encounter with law enforcement in Anchorage, Alaska, Zheng reported to a U.S. Customs and Border Protection Agent he was "retiring" to China and not returning to the United States. Later, when confronted by the FBI, Zheng changed his story and told the FBI he was visiting his critically ill father in China. Later in that same interview, Zheng said he planned to look for a job in Hong Kong or Macau because he felt OSU was going to terminate his employment. (See Exhibit C).

While Zheng was detained in Anchorage, agents interviewed Zheng's wife, Juhua "Julie" Wang and others in Ohio. The investigation revealed that the Zhengs engaged a realtor in mid-June of 2020. A local realtor reported that Julie engaged her, and that Julie noted the couple

was planning on retiring, with the possibility of moving overseas. The realtor also noted that on June 22, 2020, Julie asked the relator to sell the family home in Hilliard along with furniture.

Julie Wang made false statements during an interview with agents and even flip flopped on the facts she asserted. While there was somewhat of a language barrier, agents felt like Julie understood their questions and was being evasive. When first asked by the agents about her husband's travel to China, Julie Wang denied knowledge of the travel stating "I don't know". Later, she admitted knowing Dr. Zheng was in fact travelling to China. Mrs. Wang then denied knowing which airport her husband flew out of, stating she did not know and her husband had not told her. Mrs. Wang also denied knowing how her husband arrived at the airport in Columbus, again stating "I don't know". The agents then asked Wang if she drove her husband to the airport. Wang denied driving her husband and informed the agents she did not drive. After stating she did not drive, the agents confronted Wang stating they observed her that day, May 22nd, driving to a Home Depot to purchase mulch. After being confronted, Wang then revealed she did drive on local roads but avoided freeways. The agents again asked Mrs. Wang if she drove her husband to the airport. Wang responded negatively. The agents then re-phrased the question asking Wang; if her husband drove the car to the airport, with her as a passenger, and then she drove the car home. Mrs. Wang responded positively. In the agents' opinion Mrs. Wang deliberately used the phrasing of the question to conceal her involvement in and knowledge of her husband's travel plans. In the agents' opinion, Mrs. Wang was also deliberately deceptive in her answers regarding her driving habits. Mrs. Wang only admitted to driving vehicles after being confronted with direct evidence of her driving habits. Again, in the agents' opinion this was done in order to conceal her involvement in and knowledge of her

4

husband's travel plans.

While the defendant now asserts Zheng's home is not for sale, the other half of the story is that the listing was removed fifteen minutes after Julie's voluntary interview was completed, while her husband was detained in Alaska.

Additionally, as described below, there is evidence that Zheng is a Chinese Talent Plan participant.   Chinese Talent Plans are programs established by the Chinese government to recruit individuals with access to or knowledge of foreign technology or intellectual property. Through these plans the Chinese government has created a significant financial incentive for foreign, talented individuals to transfer international technology and intellectual property to China, licitly or otherwise. Chinese Talent Plans have resulted in or contributed to numerous, significant violations of United States law, including, but not limited to, Economic Espionage, Theft of Trade Secrets, violations of International Trafficking in Arms regulations, violations of the Atomic Energy Act, and fraud against the United States Government.

A review of a website, www.hsgac.senate.gov, revealed a staff report released in November of 2019 by the United States Senate, Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs titled: "Threats to the U.S. Research Enterprise: China's Talent Recruitment Plans" ("Senate Staff Report"). This was released as the result of an eight-month investigation. The Senate Staff Report detailed China's strategy to recruit Science & Technology (S&T) talent as follows:

> By the early 2000s, China's strategy to recruit S&T talent underwent a paradigm shift. As former [Communist Party of China] General Secretary Zhao Ziyang suggested years earlier, China was not losing brainpower, but rather it was storing its talent overseas to tap later. Chinese leaders, therefore, determined that it could be more efficient to allow its nationals to learn how to

> conduct research and develop cutting-edge technologies overseas and later
> find ways for these nationals to assist China.

Individuals recruited into the Chinese Talent Plans ("Talent Recruits") are required to perform research or develop technology in China based on legally binding contracts they receive as part of the program. These contracts are standard legal documents and specify the parties involved in the agreement, the terms of the agreement, the obligations of each party, and legal recourse available to each if the contract is broken. Talent Plan contracts typically include language specifying compliance with China's national laws, including its national laws on corporate espionage. Most Talent Plan contracts specify all intellectual property developed or created by the Talent Recruit in China is property of the Chinese employing unit.

Talent Plan contracts also specify the length and nature of the required work. These contracts obligate the Talent Recruits to work for a specified period of time in China, and often detail the specific research the Talent Recruit will perform or specify the business that is to be developed by the proposed new company.   The contract can be for either part-time or full-time employment under the program. Full-time Talent Recruits spend nine months or more each year in China, while part-time recruits continue to work primarily in the United States and travel intermittently to China. The seminal, national-level Talent Plan was initiated in 2009. It is officially known as the Recruitment Program of Global Experts, and is commonly referred to as the Thousand Talents Program and the Thousand Talents Plan ("TTP").

TTP contracts raise concerns through the contractual obligations of the TTP member. The Senate Staff Report further identified the following:

> In many cases, the contracts detail specific expectations regarding research the

6

TTP member will perform or the business he or she will develop in China. This research could resemble or replicate the work the TTP applicant performs or has performed for his or her U.S.-based employer. For example, one contract stated, "We recognize that your research in China will relate closely to your ongoing work at the [U.S. institution], and that it may be difficult to avoid comingling the results of your work." In other cases, the Chinese institution has asked the TTP member to continue operating labs in China characterized as "shadow labs." Another letter agreement between a TTP member and Chinese institution stated, "We anticipate that you will make several trips to China each year during the term of your engagement, but will perform much of your work remotely. [ ] When you are not in China, your laboratory here will be overseen by [REDACTED].

To entice high-caliber applicants—particularly applicants willing to relocate to China—the Chinese government rewards Talent Recruits with significant financial and social incentives. Each Talent Recruit draws a salary from a Chinese "employing unit," such as a laboratory or research organization, which sponsors or facilitates applications. These salaries often meet or exceed salaries the Talent Recruits draw through their non-Chinese employment. For Thousand Talent Plan Recruits, the Chinese government has been known to provide $150,000 as a signing bonus, and an additional $450,000 to $750,000 over time to support their research. Additional funding is available depending on the Talent Recruit's level of expertise and quality of performance in meeting Talent Plan goals. The Chinese government may also supply free housing or a generous housing allowance, high-quality schooling for children, jobs for spouses, healthcare, and significant tax breaks. Talent Plan funding is almost always provided free of Chinese taxes.

Talent Recruits have also been observed to either apply for or continue to use United States Government grant funding while concurrently under contract with the Chinese government via the Talent Plans, and without disclosing their participation or foreign funding on

the United States Government grant application. Other Talent Recruits or Talent Recruiters have performed duties as part of the peer review process while failing to disclose their foreign contractual obligations via the Talent Plans. This resulted in a compromise of the United States Government grant-funding process, leading to numerous Inspector General investigations, criminal charges, and civil settlements related to misuse of United States Government funds.

The Chinese government has taken active steps to protect both its Talent Plan program and also its Talent Recruits from increasing scrutiny by the United States Government, following the arrest of an individual associated with the Talent Plans in the summer of 2018. Multiple, open-source news accounts from the fall of 2018 reported that the Chinese government directed various Chinese entities to cease overtly recruiting for the Talent Plans in the United States, indicating they should instead invite United States scientists and researchers to come to conferences and forums instead of calling it a job interview or using the term "Thousand Talents Plan." The same document directed Talent Recruiters to change their communication tactics with potential recruits, directing them to use methods other than email, such as telephone or fax. The document's existence has been reported by several international media outlets, and verified by FBI source reporting.

In spite of the Chinese government's recent efforts to minimize the Talent Plans' digital footprint, the Talent Plan application process has historically been conducted almost exclusively via digital communications, primarily via email, and appears to continue as such. In many cases, a Talent Recruit uses his employment email address to establish bona fides, then transitions to personal email accounts to complete the process. A review of Talent Plan application webpages on November 27, 2018, identified email addresses continuing to be listed as primary forms of

8

communication to apply for various Talent Plans. These webpages, and others like them, provide the necessary information to apply for the program, including digital application forms and processes to digitally submit the applications to Talent Recruiters or Managers. Talent Plan applicants have been observed to routinely complete applications using these digital methods, both on local physical devices and on the digital "cloud." The applicants then send them electronically to Talent Recruiters or Managers, who work with the applicants to refine the applications using various forms of digital communication, including email, telephones, voice over IP ("VOIP") technology, text messages, private messaging applications such as WeChat, and other forms of digital communication.

A review of a website, www.nature.com, revealed an article, dated October 24, 2018, titled: "China hides identities of top scientific recruits amidst growing US scrutiny." The article notes the following:

> Lists of scholars affiliated with the Thousand Talents Plan - a Chinese government scheme to attract Chinese scientists and entrepreneurs back to their homeland - have been removed from government and institutional websites in China.
> A memo by a prominent official grant-funding agency, the National Natural Science Foundation of China, circulating on social media instructs interviewers of potential applicants to avoid e-mail correspondence, and not to mention the Thousand Talents Plan when inviting candidates back to the country.
> Another widely circulating message on social media, claiming to be from the human resources department of an institution that was not named, urges representative of fellow HR departments to delete information on their websites related to the Thousand Talents Plan, as "required by the Ministry of Education". The message asserts that the FBI is investigating researchers involved with the plan.

At the time of his arrest at Ted Stevens Anchorage International Airport (ANC), Zheng

was carrying numerous items on his electronic devices indicating he is a member of the PRC

Talent Plans. These items included but were not limited to:

- A TTP contract, signed by Zheng on March 12, 2013 was identified on his laptop

  computer. This letter of intent for "Leading Talents of Guangdong Province" was

  executed between the Third Affiliated Hospital at Sun Yat-sen University (SYSU) and

  Zheng. (See Exhibit D). The contract indicated Zheng would assume a full-time position

  at SYSU for no less than three years. Zheng's work objectives included, but were not

  limited to, setting up a world-class clinical immunology research and translational

  medicine team; leading the team in basic and clinical research; and developing high level

  international academic exchange and collaboration. (See Exhibit E).

- Images of a TTP certification booklet were also identified on Zheng's laptop computer.

  Specifically, the booklet contained Zheng's photograph, name, date of birth, passport

  number, and ID number (likely his PRC national identification number). This card was

  stamped by the Organization Department of the CCCPC and the Ministry of Human

  Resources and Social Security. A paragraph in the document states in part "The Central

  Coordination Working Group for Talents Work decides to award full time creative talents

  and entrepreneurial talents introduced according to the 'One Thousand Foreign Experts

  Program'… The state's specially recruited experts are entitled to favorable work

  conditions and daily life policies according to relevant regulations." (See Exhibit F).

- Images of a Certificate of Innovative and Entrepreneurial Team of "Pearl River Talent

  Plan" of Guangdong were also identified on Zheng's laptop computer. Specifically,

  Zheng was selected in the Sixth Batch as the leader of the Clinical Immunology Precise

Diagnosis and Treatment Translational Medicine Innovative Team brought by SYSU. This was stamped by the Talent Work Group of Guangdong in April 2017. (See Exhibit G).

- An image of a letter signed by Zheng dated December 20, 2017 addressed to the respected leaders at Guilin Medical University, a Chinese university, was found on Zheng's laptop computer. Zheng thanked them for their appreciation and outlined his achievements in funded projects, paper publications, youth recruiting, and students' cultivation. However, Zheng raised the issue that his compensation was still at the level when he was first selected. Zheng asked the university to pay 30% of what the Organization Department (per context, of the Communist Party of China) is paying the thousand talent experts. Specifically, Zheng advised the thousand talents benefits included an annual salary of 1.2-1.5 million yuan, start-up funding of 10 million yuan paid over 5 years, and a housing subsidy of 3 million yuan to be paid monthly over five years. Zheng hold the university would start paying him this amount beginning on January 1, 2018. (See Exhibit H).

- A February 2020 notepad file of a detailed query download statement from ICBC, known to be the International Construction Bank of China, where Zheng maintained accounts, was found on his laptop computer. In this statement, there are two (2) wage deposits on a bi-weekly basis from the Third Affiliated Hospital at SYSU. (See Exhibit A).

- On September 26, 2018, Zheng received an offer from OSU for a faculty position as Professor of Internal Medicine in the Department of Internal Medicine. Further, Zheng was awarded the Ronald L. Whisler Chair in Rheumatology and Immunology. A total of

$2 million was budgeted over five years for his immunology research. Zheng was to be paid $216,000 per year with the expectation he would devote 100% of his "professional efforts" to the Department. (See Exhibit I).

- OSU submitted grant 7 R01 AR059103-10 to NIH on April 19, 2019 with Zheng as the Principal Investigator (PI) and proposed project dates 04/20/2019-01/31/2021. Zheng requested in excess of $686,000. On his attached biographical sketch he included no information regarding PRC talent plans or foreign funding (See Exhibit J).

- On July 29, 2019, NIH awarded OSU, with Zheng as the PI, NIH grant 7 R61 AR073049-03 with proposed project dates 04/20/2019-02/29/2020. Zheng was awarded a budget in excess of $343,000. (See Exhibit K).

## II.  LEGAL ARGUMENT

The defendant's motion correctly sets forth, that because there are no presumptions favoring detention, the United States bears the burden of showing that there are no release conditions which would assure the defendant's appearance at future court proceedings if released.

Under 18 U.S.C. § 3142(e), a defendant shall be ordered detained pending trial if the court finds that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." When the Government bears the burden of proof, "risk of flight" must be proved by a preponderance of the evidence, *United States v. Orta*, 760 F.2d 887 (8th Cir. 1985), and danger to the community by

clear and convincing evidence, *United States v. Martir*, 782 F.2d 1141, 1146 (2d Cir. 1986). It is not necessary that the government prove both flight risk and danger to the community to warrant detention. *See United States v. Flores*, 856 F. Supp. 1400, 1401 (E.D.Cal. 1994). "The lack of reasonable assurance of **either** the defendant's appearance **or** the safety of others or the community is sufficient; both are not required." *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985) (emphasis in original) (citations omitted); *U.S. v. King*, 849 F.2d 485, 488 (11th Cir. 1988). "Clear and convincing evidence" means that the "'trier of the facts [must be able] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" *United States v. Bell*, 673 F.Supp. 1429, 1431 (E.D. Mich. 1987), quoting 30 Am.Jur.2d Evidence, §1167; see also *United States v. Lacerda*, 2013 WL 4483576, *9 (D.N.J. Aug. 19, 2013)(clear and convincing evidence must be "'clear, direct, weighty, and convincing'"), quoting *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 92 (3d Cir. 2013). While these definitions may be somewhat circular, clear and convincing evidence is a higher standard than preponderance of the evidence, which simply allows a factual finding to be made if that fact is more likely true than not true. *See*, *e.g.*, *Marlene Industries Corp. v. NLRB*, 712 F.2d 1011, 1016 (6th Cir. 1983).

Consideration of the factors enumerated in 18 U.S.C. § 3142(g) support an order of detention. As this Court knows so well, in determining whether there are conditions of release that will reasonably assure the defendant's appearance, the Court must take into account:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . .
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including:

13

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, he was on probation, on parole, or other release pending trial . . . ; and

18 U.S.C. § 3142(g).

1.      Subsection (g)(1) "**the nature and circumstances of the offense charged"**

The crimes charged by complaint involve a $4.1 million dollar theft of United States taxpayer-funded grants for the benefit of the defendant and a foreign nation; the Peoples Republic of China. There is ample and extraordinary proof the defendant is member of Chinese talent programs designed to facilitate the theft of intellectual property and the fraudulent use of the assets of the United States.

While some cases cited by the defendant resulted in light to no prison sentences, the defendant currently faces a significant potential sentence, with a maximum of 10 years for each offense (false statements involving National Security carries a maximum sentence of 10 years imprisonment). Further, none of the cases cited by the defendant were for 18 USC Section 666, Theft or Bribery Concerning Programs Receiving Federal Funds, as is the case in this matter.

In *U.S. v. Chung*, Chung, a former Boeing employee, was convicted on count 1 for conspiracy to commit economic espionage, on counts 2 through 7 for economic espionage, on count 10 for acting as an unregistered foreign agent, and on count 14 for making a false statement to federal agents after providing information obtained through employment to China.

14

*United States v. Chung,* No. 10-50074, 659 F.3d 815, 819 (9th Cir. 2011). The district court then sentenced Chung to 188 months' imprisonment and three years of supervised release. *Id.*

The defendant in *United States v. Liew* was found guilty under eight counts and convicted under the Economic Espionage Act of 1996 ("EEA") for conspiracy and attempt to commit economic espionage and theft of trade secrets, possession of misappropriated trade secrets, and conveying trade secrets of DuPont to the Chinese government. *United States v. Liew,* No. 14-10367, 856 F.3d 585, 589 (9th Cir. 2017). For these actions, Liew was sentenced to 180 months imprisonment and sentenced USAPTI to five years' probation. *Id.* at 595.

In *U.S. v. Wen Chyu Liu*, Liu was convicted was convicted on Count 1 after a jury trial for conspiring to steal trade secrets and on Count 2 for perjury after providing information from The Dow Chemical Company, his former employer, to Chinese companies. *United States v. Wen Chyu Liu,* No. 12-30105, 716 F.3d 159, 161 (5th Cir. 2013). Liu was sentenced to 60 months' imprisonment on each count (to run concurrently). *Id.*

The defendant steers his arguments away from cases in which defendants charged with similar crimes actually fled to China. Gang Liu, a defendant in a trade secret theft case presented in the US District Court for the District of Columbia, was granted pretrial release in 2017; he subsequently fled from the United States, even though he surrendered his passport, and "despite the fact that he was married to a woman in the United States" and was "reporting to Pretrial Services." *U.S. v. Shi*, Resp. to Release, ECF No. 266, at 3. He has not returned, and the United States has no ability to extradite him.

In addition, this case implicates the PRC Government's interest and conduct, and it is therefore reasonable that the PRC might assist in the defendant's flight from the United

States. And if the defendant did flee to a diplomatic safe zone, such as the PRC Embassy in Washington, D.C. or PRC Consulates in New York City, Chicago, San Francisco, Los Angeles, and Houston, there would be no way to compel his return. This is risk is heightened given that the United States has no extradition treaty with China, a country to which the defendant has deep and sustained personal, business, and governmental ties.

For these reasons, courts have recognized these concerns as legitimate, and have therefore ordered defendants detained where they have strong ties to a country beyond the reach of extradition to the United States. *See United States v. Butina*, No. 18-00218, ECF No. 15, at 6–7 (D.D.C. July 24, 2018) ("Of more obvious concern is that Defendant is a national of the Russian Federation, with which the United States has no extradition treaty."); *United States v. Ghorbani*, No. 18-00255, ECF No. 26 at 14–15 (D.D.C. September 5, 2018) ("If Defendant were to flee to Iran, or, for that matter, enter the Pakistani Embassy in Washington or its consulate in California, or that of another country friendly with Iran, he could remain outside the reach of this Court indefinitely."); *United States v. Ho,* No. 3:16-CR-46-TAV-HBG-1, 2016 WL 5875005, at *6 (E.D. Tenn. Oct. 7, 2016), *aff'd*, 2016 WL 10077327 (6th Cir. Dec. 9, 2016) ("[T]he defendant has significant ties to the government of China. Furthermore, should the defendant flee to China, the United States cannot procure his return because there is no extradition treaty with China. These factors combined suggest opportunities for flight." (citation omitted)).

The Sixth Circuit recently imposed detention under circumstances similar to those here. See *United States v. Xiaorong You*, No. 2:19-CR-14, 2019 WL 2426659, at *4 (E.D. Tenn. June 10, 2019) (stating, regarding a defendant charged with theft of trade secrets: "Defendant has traveled to China frequently. Between August 2017 and November 2018, defendant traveled to

China on four separate occasions. [Doc. 33 at 75]. During her May, 2018 trip, defendant withheld the trip's true purpose from her American employer, and then remained in the country weeks longer than her eight-day approved leave. [Id. at 23, 75]. Instead of working with her employer's Shanghai branch, defendant met with a Chinese company to sign an employment contract."). Similar to *You*, Zheng has significant overseas travel. Beginning in or around 2010 through 2019, Zheng spent a minimum of 27 days per year overseas, reaching a peak of 111 days in 2015. This was likely due in part to his commitment to the PRC talent plans. Specifically, in the above referenced contract he signed in March 2013, he was obligated to work full-time in China for no less than three years.

The charged offenses are serious; the defendant willfully and repeatedly failed to disclose his Chinese connections on applications for $4.1 million in U.S. taxpayer funded grants. Failing to disclose his PRC grants and his employment at a PRC institute and his Chinese talent plan affiliations are at the core of the fraud in this case. While the defendant points out this is not a crime of violence, it is a fraud scheme undermining our Nation's national security.

### 2. Subsection (g)(2) "the weight of the evidence against the person"

The defendant misses the mark with his conclusion that there is no evidence medical research grant funds were "stolen, embezzled, or misused." The Affidavit in support of the felony complaint highlights great weight of evidence against the defendant. As described above, there is significant evidence the defendant is a member of the PRC talent program. Additional evidence, identified during the search of Zheng's electronic devices seized at ANC demonstrates misuse of US Government funds. In a signed March 2013 Thousand Talents Plan application

identified on Zheng's laptop computer, Zheng highlighted his receipt of grant funds, including from NIH and private sources. Under the talent program, he indicated he planned "to bring innovate biological medicine product projects back to China to conduct clinical research on related diseases. The applicant is expected to make significant contribution to China's industrialization of biological medicine." Zheng went on to indicate "Currently, biomedical products are basically monopolized by USA, Europe, and Japan; the applicant will bring back several innovative products and conduct clinical transformation of the products in hoping to develop China's brand in the biomedical area." Finally, Zheng indicated "The applicant's team will use the technologies and animal models that the applicant built abroad to promote China's research and cultivate talents in immunology research at SYSU." This information shows Zheng's plan was to take his research, primarily developed through federal grant funding, back to China in order to benefit China. This was certainly not the intent of NIH providing the funding. (See Exhibit L).

As Defendant Zheng and his superiors in China well-knew, if there was full disclosure of a parallel Chinese operation harvesting resources and talent paid for by United States taxpayers, the NIH would have never issued the grants in the first place. To argue "NIH should have known" is disingenuous in the face of the defendant's efforts to hide his conflicted loyalties and cover-up his crime.

A search warrant of Zheng's Gmail email account (songguozheng@gmail.com) identified an email from Zheng to a French researcher dated on or about June 7, 2013. In this email, Zheng notified the French researcher of his selection to the "hundred person plan" (also known as the HTP), enabling him to establish an "Institute of Clinical Immunology at Sun Yat-sen

University." (See Exhibit M). During an email exchange with the same French researcher identified on Zheng's laptop during the electronic searcher of his devices at ANC, the French researcher asked Zheng to review a manuscript draft, wherein Zheng was the first author listed and his affiliation was first with SYSU, then with PSU. Zheng asked the French researcher to change the "author order and affiliation" as "this meets the award conditions of SYSU." Zheng went on to indicate "To protect my safety, my affiliation has only to be listed with US affiliation only now." A subsequent version emailed by the French researcher moved ZHENG to the last author and noted his only affiliation to be with PSU. (See Exhibit N).

Electronic searchers of Zheng's laptop seized at ANC revealed two vastly different *curriculums vitae* (CVs). First, in a PowerPoint presentation with the emblem of SYSU's Third Affiliated Hospital identified on his laptop, Zheng's background included being a leader in the "100 people project" (also known as the HTP) of SYSU, a specialist professor in the "1,000 People Program" (also known as the TTP), Chief Scientist of the state's key R&D program, winner of the National Fund's overseas youth cooperation project, and the Guangdong "Pearl River Talent Project" (PRTP) to introduce innovative venture teams. (See Exhibit O). Second, in a CV identified on the laptop with his address listed as that of OSU, dated May 1, 2020, there is no mention of any participation in any PRC talent programs. The CV does list the Outstanding Youth Medal award in 1987. (See Exhibit P).

Open source research conducted on or about May 6, 2020, the day Zheng was confronted by OSU, noted Zheng was selected as one of six leaders included in the Sixth Batch of the PRTP, believed to have been selected in or around May 2017 (http://research.sysu.edu.cn/node/1778). In a review of the same website on May 8, 2020, two days later, it appeared the announcement

publication of article 1778 had been removed, although the specific web address was still active. The Government believes this change was made after Zheng had been confronted by his employer regarding this affiliation. (Previously provided in discovery)

During his interview at ANC on May 22, 2020, Zheng confirmed he had been selected for the Guangdong Province's PRTP, as well as the Academy of Science's Hundred Talents Plan, and the Thousand Talents Program in general. However, he claimed he had never accepted any of these offers because he did not want to commit to spending nine months in China. Zheng was confronted with a press release listing his affiliation and title under the PRTP, to which he indicated they simply used his name on their recruitment list to bolster the strength of their program. (See Exhibit C).

All of the above indicates Zheng has made great efforts to conceal his affiliation with PRC talent programs and research activities. Yet evidence contained on his own computer contradicts his statements made to investigators.

Zheng cites discrete facts while his applications and collection of millions of fraudulently obtained dollars were open and notorious. Weighty evidence exists in the form of several NIH grant applications the defendant completed over numerous years, all of which required disclosure of foreign affiliations. A review of recent conflict of interest statements submitted in 2019 to his employer, OSU, reveal that the defendant failed to disclose any Chinese financial interest, time conflicts or division of loyalties, including foreign entanglements. All of this occurred as the defendant was actually a card-carrying member of Chinese talent programs. As the defendant and his superiors in the PRC well knew, if the defendant's Chinese affiliations were disclosed the NIH grants would not have been awarded or would have been withdrawn.

20

In corruption and fraud cases, the defense often attempts to redirect attention away from misdeeds and onto "the valuable work performed." But this is not defense, and not even a mitigation factor in the law. The law only focuses on the corrupt core of a fraudulent intent; in this case to us United States funding to benefit the defendant and a PRC Thousand Talents Program.

### 3.    Subsection (g)(3) "**the history and characteristics of the person**"

While the defendant cites no prior arrest history as an indicator that he will not flee, the defendant is a sophisticated medical professional who is a Legal Permanent Resident in the United States with a Chinese passport. As the cases above indicate, even seizure of the passport is no guarantee the defendant will remain in the United States. This is highlighted by the fact that the defendant has extensive financial resources, which he does not deny.

On May 6, 2020, the defendant was alerted by OSU, his employer, as to an investigation by NIH, into his fraudulent activities. (See Exhibit Q). Shortly thereafter, on May 19, 2020, the defendant started his journey to China, and by all indications, attempted to flee the United States.

The defendant booked two separate private airline carriers in the United States to get home to China. The seats on the private jets were expensive, costing up to a total of $30,000. A first class ticket on a commercial airline to China would have been far less expensive (perhaps less than $2,000), but would have carried more scrutiny at U.S. airports. Methods like the purchase of separate tickets on different private carrier airlines are often used by persons engaged in nefarious activities to cover-up travel plans.

May 22, 2020, the defendant arrived at Ted Stevens Anchorage International Airport on a private charter flight. The flight manifest indicated the defendant used Chinese passport number E99331562 (which has since been seized). Upon arrival, all passengers deplaned. While conducting outbound inspections of all the passengers, CBP officers observed the defendant allow a female passenger to take possession of his roller bag and black computer bag. CBP asked this passenger if all the bags in her possession were hers, and she indicated that the two bags belonged to the defendant. When asked if the female passenger and the defendant were traveling together, the female passenger replied that they were not, that they did not know each other, and she was just helping him because he had too many bags. The defendant was then asked if the two bags were his, which he confirmed. When CBP opened these items of luggage, they identified numerous electronic devices, as described above. The defendant had a substantial amount of luggage, as if for a long trip or permanently moving. However, only his carry-on luggage contained any electronic devices. When asked later about handing-off his luggage, the defendant claimed the other passenger had asked to help him with his luggage. It is widely known that handing off luggage at airports by individuals who do not want their bags searched, can be an attempt to prevent officials from searching. Further, the electronic devices were preliminarily determined to contain research data, documents, and other work product facilitating and furthering the grant fraud scheme. Analysis of the electronically stored information is ongoing.

As the defense notes, on one occasion, Zheng disclosed to NIH his work on a project receiving a grant in China. Specifically, in a Revision Application for NIH grant 2 R01 AR059103-07 submitted on 03/03/2016 for an administrative supplement originally submitted on

22

06/30/2014 (612 days later), in the "Ongoing Research Support" portion of his "Biographical Sketch," Zheng noted he was the Principal Investigator for a SYSU Key Project from 07/01/2014-06/30/2017. As described above, Zheng's activities began in or about 2013 and continued well beyond 06/30/2017 and were not disclosed.

Specifically, open source research identified Zheng received funding from the PRC National Natural Science Foundation (NSFC) via approval number 81871224 in the amount of "57.00 Ten Thousand yuan" for research period 01/01/2019-12/31/2019. The search warrant of electronic devices at ANC on 05/22/2020 revealed documents related to NSFC grant 81871224, including a Project Funding document produced by the NSFC with Zheng as the PI, with email address zhengsg3@mail.sysu.edu.cn. On or about 02/27/2019, Zheng emailed an OSU employee notifying him he intended to bring a J1 researcher to OSU. He provided a support letter for her studies, which noted she was funded by NSFC grant 81871224.

The defendant portrays his wife as a unsophisticated, confused person who nervously got it wrong when she made misstatements near the time of the defendant's arrest. However, Julie Wang has been her husband's right-hand person. As a condition of his employment with OSU, the defendant demanded his wife, a formerly California certified RN, be employed by OSU as his lab manager. A task such as a medical research lab manager is neither for the timid nor simpletons. The same day as the defendant's arrest (Friday May 22, 202) Julie Wang, the defendant's wife, was interviewed by law enforcement and made several false statements. Most significantly, she first denied then admitted to facilitating the defendant's recent transport in the family car to the airport, denied the family home was for sale, indicated her husband, the

23

defendant, was in Los Angeles to renovate an apartment the couple co-owns, and denied

knowing he was going to China. This voluntary interview was not plagued by confusion, but was

a calculated effort to throw law enforcement off the tracks of Defendant Zheng.

24

## III.   CONCLUSION

The defendant is a flight risk. He has the incentive and means to flee, he has the connections and resources in China to continue his life there. If he flees, he will not come back. There are no conditions or combination of conditions which will reasonable assure the appearance of Defendant Song Guo Zheng, so that detention is necessary before trial. Additionally, we request that this motion and all related orders and documents be filed Under Seal.

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney

**s/Douglas W. Squires**
DOUGLAS W. SQUIRES (OH 0073524)
S. COURTER SHIMEALL (OH 0090514)
Assistant United States Attorneys
CHRISTOPHER ST. PIERRE (OH 0097673)
Special Assistant United States Attorney
Attorneys for Plaintiff
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
(614) 469-5715
Fax: (614) 469-5653
Douglas.Squires @usdoj.gov

**s/Matthew J. McKenzie**
MATTHEW J. MCKENZIE (NY 4791513)
Trial Attorney
Counterintelligence and Export Control
Section
National Security Division
950 Pennsylvania Ave, NW
Washington, DC 20530
(202) 514-7845
Matthew.McKenzie@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing government's Response to defendant's motion for bond and request for sealing was served this 8th day of July 2020, electronically on all counsel of record.

s/Douglas W. Squires
DOUGLAS W. SQUIRES (OH 0073524)
Assistant United States Attorney
